[No. 68332-2-I. Division One. July 23, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. SHERYL JEAN MARTIN, *Appellant*.

*Catherine E. Glinski*, for appellant.

*Anthony F. Golik, Prosecuting Attorney*, and *Anne M. Cruser, Deputy*, for respondent.

¶1 GROSSE, J. — Under ER 702, opinion testimony by an expert witness must be based on a theory generally accepted in the scientific community. Here, the trial court conducted a *Frye*[1] hearing and determined that the betrayal trauma theory espoused by the defendant's expert was not generally accepted in the scientific community and,

---

[1] *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923).

further, that even if the theory met the *Frye* standard for delayed reporting of childhood sexual abuse, it was not established as a theory relevant to adult domestic violence and thus not particularly helpful to the issue of intent in a domestic violence case. The trial court is affirmed.

## FACTS

¶2 In the early morning hours of September 8, 2007, Sheryl Martin called 911 and stated that she had shot her husband, Eddie Martin.[2] The shooting occurred shortly after Eddie had told her that he had been having an affair. Sheryl and Eddie had been drinking and smoking marijuana that night in the shop on their property. At approximately 9:00 p.m., Sheryl returned to the main house. Eddie grabbed another beer and went to his pickup truck to retrieve his cell phone to text his girl friend. Sheryl observed Eddie and came back, demanding to see his phone. A verbal altercation ensued, during which Eddie told her he was having an affair. Sometime during the altercation, divorce was mentioned, but Eddie testified that they were always fighting and sometimes divorce became an issue. During this altercation, Sheryl grabbed a fillet knife and the shotgun that was in the shop. Eddie pried the weapons from her hands, and Sheryl left the shop. Eddie grabbed another beer and went into the camper to sleep. Sheryl returned to the camper to retrieve a set of keys to the camper. Eddie went to sleep and woke up as he was shot twice in the legs. Eddie saw Sheryl with the 16 gauge shotgun. Eddie recalled Sheryl saying something like, "If I can't have you, nobody can." Sheryl then left the camper. In less than five minutes, Sheryl returned and shot Eddie two more times, hitting both arms.

¶3 The State charged Sheryl with attempted murder in the first degree and, in the alternative, assault in the first degree.

---

[2] For clarity, we refer to the parties by their first names.

¶4 Sheryl notified the State that she intended to rely on a diminished capacity defense based on the findings of psychologist Dr. Laura Brown that she was in a dissociative state at the time of the shooting. Dr. Brown also diagnosed a depressive disorder and histrionic personality disorder. Dr. Jennifer Freyd opined that Sheryl was suffering from betrayal trauma, which led to her dissociative state.

¶5 The State requested a *Frye* hearing to determine whether betrayal trauma theory (BTT) is generally accepted in the psychological community. At the hearing Dr. Brown testified that the depressive disorder and histrionic personality disorder led to symptoms of dissociation at the time of the incident. Dr. Brown also testified that BTT helped to explain the reasons for the dissociative state. Dr. Freyd had developed BTT and testified extensively about the negative impacts of betrayal trauma, including dissociation and depression. She theorized that Sheryl's dissociation enabled her to stay in an abusive relationship for several years.

¶6 The State presented two experts, psychologists Dr. Marilyn Ronnei and Dr. Richard Packard. Dr. Ronnei, who evaluated Sheryl at the State's request, diagnosed post-traumatic stress disorder, major depressive disorder, and alcohol and cannabis abuse. Dr. Ronnei agreed that Sheryl was dissociating at times but did not believe that the dissociation impaired Sheryl's ability to form the requisite intent. Dr. Packard conducted a forensic evaluation of Sheryl. Dr. Packard researched BTT and testified that Dr. Freyd and her associates were the only ones who had developed significant data supporting it and many of their colleagues questioned the reliability of the theory.

¶7 The trial court reviewed a number of articles discussing the theory, including more than a dozen submitted by Sheryl. Although the court found references to research on the subject of domestic violence in the context of betrayal trauma, it found that the theory was not widely studied in this context. The trial court found that BTT remained very

controversial and that even if it met the *Frye* standard for delayed reporting of childhood sexual abuse, its relevance to adult domestic violence had not been established.

¶8 The trial court ruled inadmissible four declarations by psychologists that BTT was widely accepted in the scientific community. The court found that BTT was inadmissible under ER 702, ER 401, or ER 402.

¶9 The court ruled that Dr. Brown could testify regarding the diagnoses of depressive disorder and histrionic personality disorder and their effect on dissociation. The trial court found that the disorders and symptoms of dissociation presented in this case were similar to disorders that have been recognized in Washington as mental conditions supporting the theory of diminished capacity.

¶10 A jury convicted Sheryl of attempted first degree murder. She appeals.

## ANALYSIS

¶11 Sheryl contends the trial court erred in excluding expert testimony on betrayal trauma theory, as well as evidence of her husband's prior past acts, and in finding that there was sufficient evidence to establish probable cause for a search warrant.

Betrayal Trauma Theory (BTT)

¶12 Sheryl first contends that BTT is admissible under ER 702, relying on *Carlton v. Vancouver Care, LLC*.[3] But that case is inapposite as it specifically limited its holding to civil cases.[4] More similar to the case at bar is *State v. Black*.[5] There, a rape counselor's testimony that the alleged victim suffered from "rape trauma syndrome" was held inadmissible, not only because the evidence did not pass the

---

[3] 155 Wn. App. 151, 164, 231 P.3d 1241 (2010).

[4] *Carlton*, 155 Wn. App. at 167.

[5] 109 Wn.2d 336, 745 P.2d 12 (1987).

*Frye* test but also because such testimony would " 'invade the jury's province of fact-finding and add confusion rather than clarity.' "[6]

■ ¶13 To determine the admissibility of expert testimony based upon novel scientific theories or methods, courts have long used the "general acceptance" standard as set forth in *Frye*.[7] In *State v. Gregory*, our Supreme Court noted that "[b]oth the scientific theory underlying the evidence and the technique or methodology used to implement it must be generally accepted in the scientific community for evidence to be admissible under *Frye*."[8] " 'If there is a significant dispute among qualified scientists in the relevant scientific community, then the evidence may not be admitted.' "[9]

■ ■ ¶14 Whether a theory or technique has been generally accepted in the scientific community may be determined by several methods. "General acceptance may be found from testimony that asserts it, from articles and publications, from widespread use in the community, or from the holdings of other courts."[10] Where reasonable dispute exists regarding general acceptance, such acceptance must be established by a preponderance of the evidence at hearings held pursuant to ER 104(a).[11]

■■ ¶15 Sheryl sought to introduce evidence of BTT as espoused by Dr. Freyd, a professor of psychology at the

---

[6] *Black*, 109 Wn.2d at 350 (quoting *State v. Saldana*, 324 N.W.2d 227, 230 (Minn. 1982)).

[7] *See, e.g.*, *State v. Copeland*, 130 Wn.2d 244, 922 P.2d 1304 (1996); *State v. Riker*, 123 Wn.2d 351, 869 P.2d 43 (1994).

[8] 158 Wn.2d 759, 829, 147 P.3d 1201 (2006).

[9] *Gregory*, 158 Wn.2d at 829 (emphasis omitted) (quoting *State v. Gore*, 143 Wn.2d 288, 302, 21 P.3d 262 (2001)).

[10] *State v. Kunze*, 97 Wn. App. 832, 853, 988 P.2d 977 (1999) (footnotes omitted); *Lake Chelan Shores Homeowners Ass'n v. St. Paul Fire & Marine Ins. Co.*, 167 Wn. App. 28, 272 P.3d 249 (2011), *petition for review filed*, No. 87256-2 (Wash. Apr. 13, 2012).

[11] *Kunze*, 97 Wn. App. at 843.

University of Oregon. Dr. Freyd is the editor of the *Journal of Trauma & Dissociation*. Dr. Freyd published a book titled *Betrayal Trauma: The Logic of Forgetting Childhood Abuse* (1998). Dr. Freyd recounted the start of the research, testifying that it begins with repressed memories and delayed recall, just as someone enduring an event such as child sexual abuse might forget it for a long period of time and then remember it. In essence, a person who is mistreated by someone on whom they are dependent represses the awareness of the betrayal to continue to be attached to the person. The court found that the theory of BTT was not relevant to the issue before it—whether Sheryl had the requisite intent to commit the crime. Neither expert adequately explained how a theory, the core of which goes to the question of motive to "forget something important," relates to the inability to form intent. Both Dr. Freyd and Dr. Brown testified that BTT explained why adults stay in abusive relationships and how remaining in such relationships could lead to dissociation, which allows victims to ignore traumatic events and not act on them. Thus, even assuming that BTT were generally accepted in the scientific community as a theory pertaining to repressed memory, there was no evidence that it has been applied in the context proposed here. Sheryl's experts testified that BTT was relevant because it influenced dissociation, but her dissociative state was undisputed. The challenge is whether that dissociative state led to her inability to form intent, and no one asserts that BTT is relevant to that issue. As the Supreme Court recently opined in *Anderson v. Akzo Nobel Coatings, Inc.*,[12] even if *Frye* is satisfied,

> the evidence must still meet the other significant standards of admissibility. For example, persons performing experiments and interpreting results must be qualified. ER 702 and ER 703 mandate the evidence must be relevant and helpful.

---

[12] 172 Wn.2d 593, 606, 260 P.3d 857 (2011).

Sheryl argues that Dr. Freyd had testified previously in federal court regarding BTT. But the facts of that case were significantly different than those here. Her testimony there essentially explained the delay in reporting alleged sexual abuse by a high school teenager. Dr. Freyd's testimony in this case reviewed Dr. Ronnei's interview with Sheryl and, based on that review, found Sheryl displayed signs and symptoms of betrayal trauma and experienced a peritraumatic dissociative episode when she shot her husband. Further, BTT is not included in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* (4th rev. ed. 2000) as an accepted medical diagnosis for dissociative disorders. The trial court did not err in excluding this theory.

Prior Acts of the Victim

¶16 Sheryl argues that the admission of evidence about her husband's mistreatment of her was crucial to her defense of diminished capacity. Sheryl asserts that her diminished capacity defense required her to produce expert testimony that demonstrated "a mental disorder impair-[ing] her ability to form the culpable mental state to commit the charged offense."

¶17 The admissibility of evidence is within the sound discretion of the trial court, and an appellate court will not disturb that decision unless no reasonable person would adopt the trial court's view.[13] Evidence of specific instances of conduct is admissible only if the character trait is "an essential element of a charge, claim, or defense." ER 405(b). A victim's character and prior misconduct in general are excluded from evidence. Our Supreme Court has held that the Sixth Amendment is violated where a defendant is effectively barred from presenting a defense due to the

[13] *State v. Thomas*, 123 Wn. App. 771, 778-79, 98 P.3d 1258 (2004) (citing *State v. Atsbeha*, 142 Wn.2d 904, 913-14, 16 P.3d 626 (2001)).

exclusion of evidence.[14] Thus, where a defendant claims self-defense, courts have admitted evidence of a victim's prior acts of violence to establish a defendant's reason for apprehension and the basis for acting in self-defense.[15] But in self-defense cases, "[s]pecific act character evidence relating to the victim's alleged propensity for violence is not an essential element of self-defense."[16]

¶18 Here, the court permitted general references to the nature of the spousal relationship as relevant to Sheryl's mental state, thus permitting evidence of a volatile marriage, Sheryl's unhappiness, and emotional isolation. Also, the court ruled that any evidence of misconduct the night of the incident was admissible.

¶19 Sheryl relies on *State v. Grant*,[17] *State v. Lopez*,[18] and *State v. Eaton*,[19] but none of these cases are particularly helpful. In *Grant*, this court held that the prior misconduct of a defendant could be admitted under ER 404(b) to explain why the victim's statements and conduct might appear inconsistent with her trial testimony.[20] In *Lopez*, this court held that the defendant's criminal connections were admitted to show the victim's state of mind and not to demonstrate criminal propensity.[21] In *Eaton*, this court found that a psychiatrist could rely on statements made by the defendant in forming an opinion about the defendant's mental condition at the time of the crime.[22]

---

[14] *State v. Jones*, 168 Wn.2d 713, 230 P.3d 576 (2010) (rape conviction reversed because defendant precluded from testifying to his version of the act).

[15] *State v. Cloud*, 7 Wn. App. 211, 218, 498 P.2d 907 (1972).

[16] *State v. Hutchinson*, 135 Wn.2d 863, 887, 959 P.2d 1061 (1998).

[17] 83 Wn. App. 98, 920 P.2d 609 (1996).

[18] 142 Wn. App. 341, 174 P.3d 1216 (2007).

[19] 30 Wn. App. 288, 633 P.2d 921 (1981).

[20] 83 Wn. App. at 105.

[21] 142 Wn. App. at 355.

[22] 30 Wn. App. at 293-94.

¶20 Here, expert testimony was introduced that indicated that Sheryl was in a dissociative state. Dr. Brown testified that Sheryl's histrionic personality disorder coupled with her depression and the stress of learning of her husband's affair and that he wanted a divorce caused her to experience a dissociative episode.

¶21 Dr. Brown testified that she interviewed Sheryl for four hours after reviewing a report, listening to the 911 tape, and other interviews. Dr. Brown diagnosed her with dysthymic disorder (chronic low-level depression) and histrionic personality disorder. Histrionic personality disorder essentially describes a person who is pathologically people-pleasing and concerned with appearance and being too nice. Dr. Brown testified as to Sheryl's perceptions of the marriage. According to Brown, Sheryl found her husband extremely unromantic, sometimes cruel, doing things that were frightening to her because he knew they would scare her, and demanding things from her that she felt uncomfortable with. Sheryl told Brown that her husband would go to strip clubs, that she was certain about one affair that he had, and that she herself had had an affair early on in the marriage. As in *Eaton*, the psychiatrist testified to support the diminished capacity defense and these otherwise hearsay statements of Sheryl were used by Dr. Brown in forming her diagnosis. In addition to recounting the events as told to her by Sheryl, Brown testified that Sheryl's responses in psychiatric testing revealed that she had genuinely experienced dissociation the night of the incident. Sheryl's diminished capacity defense, which was based on her dissociative state, was raised and placed at issue before the jury.

Search Warrant

¶22 Sheryl argues that the search warrant affidavit was insufficient and did not contain any facts describing a nexus between the crime, the evidence to be seized, and the places searched. A trial court's legal conclusion as to whether an affidavit establishes probable cause

is reviewed de novo.[23] This court's review is limited to the four corners of the affidavit. In other words, this court considers the information that was available to the issuing magistrate. We review that magistrate's decision to issue the warrant for an abuse of discretion.[24] A magistrate's decision is given great deference.

¶23 Here, the trial court found that the responding detectives made an illegal search of the premises without a warrant. The trial court redacted the affidavit by striking the information obtained from the prior warrantless search, i.e., "28 gauge" and "an additional shotgun." The court also struck the following statements from the warrant:

> A search for any additional people or suspects on the scene revealed a shotgun located in the kitchen of the main residence lying on a center island, with two live shotgun shells lying next to it. Another shotgun was found upstairs with the breach open and a box of shotgun shells sitting next to it.

The trial court found that Sheryl's statements to Deputy Jeremy Koch at the scene that she had shot her husband after she found out he had been having an affair for two years was admissible to establish probable cause for the search warrant affidavit, even though not admissible in the State's case-in-chief.

¶24 The affidavit also contained information that the officers on the scene heard yelling from a camper parked in front of the shop where they discovered Eddie, who told the officers that his wife had shot him.

¶25 These facts establish a sufficient nexus to permit the officers to search the premises for the weapon used in the shooting. Once the document was redacted there was still sufficient evidence on which a magistrate could issue a search warrant. The 911 call in which Sheryl said she had shot her husband, Sheryl's statement to the police that she

---

[23] *State v. Neth*, 165 Wn.2d 177, 182, 196 P.3d 658 (2008).

[24] *State v. Maddox*, 152 Wn.2d 499, 98 P.3d 1199 (2004).

shot him, and Eddie's injuries were sufficient to establish a nexus between the items sought, the shotguns, and the crime. Moreover, Sheryl is unable to show any prejudice from the admission of these shotguns as her husband testified that she shot him with a shotgun.

¶26 Affirmed.

ELLINGTON and SCHINDLER, JJ., concur.

Review denied at 176 Wn.2d 1005 (2013).